UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISMAEL RODRIGUEZ,<br><br>Defendant. | Case No. 1:19-CR-00133-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Ismael Rodriguez's Motion to Suppress (Dkt. 22) and Motion to Compel (Dkt. 27). For the reasons set forth below, the Court GRANTS in part and DENIES in part Rodriguez's Motion to Suppress and DENIES Rodriguez's Motion to Compel as MOOT.

## II. BACKGROUND

On March 18, 2019, at 3:50 p.m., law enforcement officers were dispatched to Nampa Commercial Tire after employees there reported that a person in the store was "inside rambling on, acting strange." Dkt. 22-1, Ex. A. Commercial Tire employees stated that Ismael Rodriguez had pulled up in a white Cadillac and that they were concerned because he appeared to be under the influence. For instance, when he arrived at the tire store, Rodriguez went to the counter and attempted to order two sodas. He then proceeded to follow customers around the store and employees into service bays.

MEMORANDUM DECISION AND ORDER - 1

Corporal Douglas Kern was the first officer at the scene. When he arrived, Kern viewed the white Cadillac and ran the license plate. The plate was for a blue 2002 Chevy Cavalier, not a white Cadillac. Kern walked past the Cadillac on his way into the store and saw that the vehicle was still running and was parked outside Commercial Tire's entrance—an area not designated for parking. Kern quickly glanced inside the vehicle and confirmed there was no one in the car.

Once inside Commercial Tire, a staff member pointed Kern towards the bathroom area of the store. As he began walking towards the bathroom area, Kern encountered Rodriguez. Kern stated, "how's it going dude?" Dkt. 22-2, Ex. B at 0:30. Rodriguez gave Kern a slight smile and wave as he attempted to exit through a door leading to one of the store's service bays. Kern directed Rodriguez to stop. As Rodriguez did so, Kern noticed Rodriguez was squinting and repeatedly clenching his jaw—physical signs consistent with drug use. Dkt. 22-3, Ex. C. Kern asked Rodriguez if he was lost. Rodriguez's slurred response was "no, just kinda tired." *Id*. at 0:35.

Kern then viewed a large bulge in Rodriguez's front left pocket. Kern could not tell if the bulge was a weapon and asked Rodriguez if he had anything on him "that you ain't supposed to have? No guns or nothing?" *Id*. at 0:43–45. Rodriguez responded in the negative as he patted at his pockets. Kern asked Rodriguez to pull up his shirt so he could see Rodriguez's waistline. *Id*. at 0:48–50. Rodriguez began to lift his shirt but instead quickly thrust his hands into his pockets. *Id*. at 0:55. As Rodriguez did so, Kern's demeanor quickly changed. *Id*. Kern told Rodriguez, "listen to me. Do exactly what I say or your ass is going to end up in the dirt, got it?" *Id*. at 1:00. Rodriguez insisted he wasn't doing

anything and put his hands up. Kern repeated, "don't do anything else or your ass is in the dirt, you hear me?" *Id*. at 1:00–1:10. Rodriguez then rolled his eyes and lowered his hands. After Kern ordered him three times to put his hands on his head, Rodriguez complied. *Id*.

Using his right hand to hold Rodriguez's hands to the back of his head, Kern ordered Rodriguez to turn around and spread his feet. When he did not immediately comply, Kern used his foot to spread Rodriguez's feet apart. *Id*. at 1:12. As he did this, Kern told Rodriguez twice that he was not "fucking playing." *Id*. at 1:14–1:18. At that point, Officer William Koho arrived and Kern asked him to check Rodriguez's right side as Kern patted down Rodriguez's left side. While patting down Rodriguez's right side, Koho reached directly into Rodriguez's right front and back pockets and pulled out a roll of cash from the right front pocket. Dkt. 22-4, Ex. D at 2:02. After showing the cash to Kern, Koho returned it to Rodriguez's right front pocket. *Id*. at 2:11.

Kern, his voice calm again, then questioned Rodriguez, "so I'm gonna ask you real quick, is there anything in your pockets that you ain't supposed to have?" Dkt. 22-2, Ex. B at 1:35. Rodriguez replied, "no." *Id*. at 1:39. Kern gestured towards Rodriguez's left front pocket and stated, "anything in this pocket that you ain't supposed to have?" *Id*. at 1:40. Rodriguez replied, "not that I know of." *Id*. Kern questioned, "ok, can I get that stuff out of your pocket then?" *Id*. at 1:43. Rodriguez stated, "go ahead and get everything out." *Id*. at 1:45.

Kern told Koho to call for a canine unit and then began to pull a large Ziploc bag out of Rodriguez's left front pocket. *Id*. at 1:48. Seeing what appeared to be a controlled substance in the bag, Kern told Rodriguez he was going to place him in handcuffs. *Id*. at

MEMORANDUM DECISION AND ORDER - 3

2:05. As Kern handcuffed him, Rodriguez volunteered that the bag contained heroin. *Id*. at 2:22. Kern then explained to Rodriguez that he was arresting him and what was going to happen next. On the way to Koho's patrol vehicle, Rodriguez questioned Kern, "is that shit considered a life sentence?" *Id*. at 5:15. Kern responded, "no we don't really do life sentences here in Idaho, are you from California?" *Id*. at 5:20. Rodriguez responded, "I got heroin on me, shit!" *Id*. at 5:23. Kern then read Rodriguez his *Miranda* rights.

While Kern gave Rodriguez his *Miranda* warnings, Koho pulled the bag of heroin out of Rodriguez's left front pocket and put it in the back of his vehicle. Koho continued to search Rodriguez and retrieved a cell phone, the wad of cash, and additional loose bills from Rodriguez's right front pocket.[1]

After placing everything in an evidence envelope in the back of his vehicle, Koho asked Rodriguez, "hey, who is the car registered to . . . and why do you have fictitious plates on it?" *Id*. at 9:04–9:06. Rodriguez responded, "I don't know." *Id*. at 9:07. Koho asked again, "is that your car, I mean you were driving it right?" Dkt. 22-4, Ex. D, at 10:00. Rodriguez answered, "yes. . . it's a buddy of mine's, somewhere over there," and looked off to his right. *Id*. at 10:03. Koho stated, "so it's someone else's car, the one you were just driving?" *Id*. at 10:07. Rodriguez responded, "yeah." *Id*. at 10:08. Koho asked, "what's your buddy's name, so we can get ahold of him to come get his car?" *Id*. at 10:11.

---

[1] Rodriguez accuses Koho and Kern of committing intentional misconduct because, in their police reports, both Kern and Koho omitted any reference to discovering the cash during their initial pat-down, and Koho also suggested he "found" the wad of cash after the officers "transitioned from an investigatory detention, to an arrest and conducted a full search of his person incident to arrest." Dkt. 22, at 7-8 (citing Dkt. 22-6, Ex. F at 2). The Court will address this issue in the analysis portion of this Order.

MEMORANDUM DECISION AND ORDER - 4

Rodriguez mumbled something and then yelled, "why did I get put in this situation? I don't even like . . . talking to you!" *Id*. at 10:22.

As Koho continued to try and identify the owner of the car, Rodriguez eventually invoked his right to an attorney, stating, "yeah, I want to call my lawyer dude. Can I call my lawyer now dude?" *Id*. at 12:25. Koho stated, "ok, I'm not going to ask you about the heroin anymore but I'm still trying to figure out where the car belongs." *Id*. at 12:37–12:42. Rodriguez mumbled something about needing to call his wife to bail him out. *Id*. Koho told Rodriguez to hang tight while he got the "car thing sorted out." *Id*. at 13:40.

Koho then closed Rodriguez in the back of the squad car and walked towards the Cadillac. As he did so, Koho advised Kern that Rodriquez had invoked his *Miranda* rights, telling him: "He invoked *Miranda*, He admitted that it's heroin, but he said he wants his attorney."[2] *Id*. at 13:45–13:52. Koho then approached the Cadillac, where Officer Friedli was waiting with his drug detection canine. Friedli circled the Cadillac with the canine, and the dog positively alerted twice to the driver's side door. *Id*. at 15:19–15:39. Koho and Friedli subsequently searched the vehicle. Inside, they found drug paraphernalia in the ashtray, a Kel Tec .22 caliber semiautomatic pistol between the center console and the passenger seat, and a large bag of methamphetamine inside a suitcase on the back seat. Dkt. 22-5, Ex. E at 2.

Officer Koho took the gun and the methamphetamine to his vehicle. When he arrived, Kern advised Koho that Rodriguez had bent the frame of Koho's car by banging

---

[2] Although Kern is not visible on the body camera footage, it appears to be Kern to whom Koho is talking and Kern's voice responds, "oh, so he changed his mind." *Id*. at 13:55.

his head against it and had picked up "another charge." Dkt. 22-4, Ex. D, at 22:47. When Koho opened the back door of his car to secure the contraband, Rodriguez turned around to look at Koho and immediately asked him about the gun. *Id*. at 23:14. Koho responded that it was stolen. Rodriguez questioned, "for real?" *Id*. at 23:17. Rodriguez continued to question Koho, but Koho told him to hang on and the officers would sort things out. *Id*. at 23:30.

Koho returned to the Cadillac to continue the search and learned Friedli had discovered two additional large bags of methamphetamine in the suitcase found in the back seat. When Koho returned the bags to his vehicle, Rodriguez again attempted to talk to him. *Id*. at 25:40. Koho did not respond and returned to the Cadillac, where Friedli had discovered another small bag of a suspected controlled substance. Koho took the small bag to his car and Rodriguez stated he didn't realize he had heroin in his pocket. *Id*. at 29:40. Koho then asked him, "what do you want us to do with your suitcase?" *Id*. at 29:44. Rodriguez responded that Koho should just leave it in the Cadillac.

Several minutes later, Detective Coronado, from the Nampa Police Department's investigative unit, arrived at the scene. Koho briefed Coronado on the situation and advised him that Rodriguez had asked to speak to his attorney. *Id*. at 33:52. Koho described Rodriguez's request as "kind of a weak invocation of *Miranda*." *Id*. at 33:57. Coronado immediately began to question Rodriguez, but eventually ended the conversation due to Rodriguez's agitated state. Dkt. 22-8, Ex. H at 1. Rodriguez was subsequently booked into the Canyon County Jail.

The following day, on March 19, 2019, Coronado and Sergeant Hudson went to the

Canyon County Jail to attempt to speak to Rodriguez while he was sober.[3] *Id*. at 2. Upon arrival, Hudson again read Rodriguez his *Miranda* rights. *Id*. Coronado explained to Rodriguez that he was there to interview him, and Rodriguez immediately asked about the quantity of drugs officers had found in the Cadillac. *Id*. Coronado advised Rodriguez that approximately five pounds of methamphetamine had been discovered in the car. Rodriguez stated he was aware he had methamphetamine but didn't realize he was holding such a large quantity.[4] *Id*.

On April 10, 2019, Rodriguez was indicted for possession with intent to distribute methamphetamine, possession with intent to distribute heroin, and carrying a firearm in furtherance of a drug trafficking crime. Dkt. 1. Rodriguez filed the instant Motion to Suppress on January 3, 2020. Rodriguez argues Koho's search of his right front pocket was an illegal search and was the impetus for a chain of events leading to the discovery of the contraband and evidence that is the basis for the Government's case. Rodriguez asks the Court to suppress the contents of his pockets, the contraband found in the Cadillac, and all statements he made both before and after invoking his *Miranda* rights. Dkt. 22, at 25.

After continuances at the request of counsel and due to the COVID-19 pandemic, the Court held an evidentiary hearing on the Motion to Suppress on May 27, 2020.

---

[3] Although he does not specifically so state, it appears that Rodriguez had not consulted with an attorney prior to, and did not have counsel during, the March 19, 2019 meeting.

[4] There is no video footage for the May 19, 2019 encounter, so the Court relies on Detective Coronado's Officer Report for the aforementioned facts. Dkt. 22-8, Ex. H.

MEMORANDUM DECISION AND ORDER - 7

### III. LEGAL STANDARD

**A.      Fourth Amendment**

The Fourth Amendment guarantees the right of individuals to be secure in "their persons, houses, papers, and effects, against all unreasonable searches and seizures[.]" *Mapp v. Ohio*, 367 U.S. 643, 647 (1961). Searches and seizures conducted without a warrant are "*per se* unreasonable under the Fourth Amendment" subject to "a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations omitted). In most instances, failure to comply with the warrant requirement can only be excused by exigent circumstances or other carefully delineated exceptions to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Several exceptions to the warrant requirement are potentially relevant in this case.

First, in *Terry*, the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming his suspicions. *Terry*, 392 U.S. at 30. *Terry* also held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id*. at 24. An investigatory stop must be both "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*.

at 20.

Second, a "search conducted pursuant to a valid consent is constitutionally permissible." *Schneckcloth v. Bustamonte*, 412 U.S. 218, 222 (1973). When the government relies upon consent to justify the lawfulness of a search, it has the burden of showing the consent was freely given. *Id*.

Finally, the automobile exception to the warrant requirement permits police to search a vehicle when the car is "readily mobile" and where "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citation omitted). Even in the absence of an arrest, the police may search both an automobile and the containers within it "where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

If a search is conducted without a warrant absent an exception to the warrant requirement, then the evidence discovered through the "exploitation of" an illegal search or seizure, must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Evidence qualifies as "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989) (quoting *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980)). The prosecution bears the burden of showing that evidence is not the fruit of an illegal search or seizure. *Johns*, 891 F.2d at 245.

The Supreme Court has developed three exceptions to the fruit of the poisonous tree doctrine, "which allow for admission of evidence derived from official misconduct." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989). These three

exceptions are the "independent source" exception, the "attenuated basis" exception, and the "inevitable discovery" exception.[5] *Id.*

The "independent source" exception operates to admit evidence that is "actually found by legal means through sources unrelated to the illegal search.*" Id.* (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)). "Independent source evidence is not 'fruit of the poisonous tree' because its discovery through independent legal means does not result from the official's illegal conduct." *Ramirez-Sandoval*, 872 F.2d at 1396 (quotation marks in original).

The attenuated basis exception "applies when the connection between the illegality and the challenged evidence has become sufficiently weak so as to dissipate the taint caused by the illegality." *Id.* (citing *Wong Sun*, 371 U.S. at 488). For instance, a defendant's "intervening independent act of free will" may be sufficient to attenuate a constitutional violation. *Wong Sun*, 371 U.S. at 486.

The inevitable discovery exception, adopted by the Supreme Court in *Nix v. Williams*, 467 U.S. 431 (1984), allows introduction of illegally obtained evidence "if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means." *Ramirez-Sandoval*, 872 F.2d at 1396 (citing *Nix*, 467 U.S. at 444). The inevitable discovery doctrine requires that "the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." *United States v. Boatwright*, 822 F.2d 862, 864–65

---

[5] The Government contends the attenuated basis and inevitable discovery exceptions apply in this case. Dkt. 23, at 10.

(9th Cir. 1987).

Although there are three exceptions to the "fruits" doctrine, they are closely linked to one another. *Ramirez-Sandoval*, 872 F.2d at 1396. The three exceptions "converge to a certain extent, as in each case '[t]he core inquiry is whether the police would have discovered the evidence if the misconduct had not occurred.'" *Id*. (quoting *United States v. Namer*, 835 F.2d 1084, 1087 (5th Cir. 1988)).

## B.    Fifth Amendment

In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme Court held the Fifth Amendment's prohibition against compelled self-incrimination requires that defendants must be advised of their right to remain silent and right to an attorney prior to a custodial interrogation. The *Miranda* Court also identified procedures police must follow subsequent to such warnings. If an accused indicates that he wishes to remain silent, "the interrogation must cease." *Id*. at 474. Similarly, if an accused requests counsel, the interrogation "must cease until an attorney is present." *Id*. If police obtain statements after a suspect has unequivocally invoked the right to counsel, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id*. at 475.

However, even where a suspect unambiguously invokes his right to an attorney, officers may continue questioning if "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). A comment or question that indicates "a willingness and a desire for a generalized discussion about the investigation," constitutes such an initiation. *Oregon v. Bradshaw*,

462 U.S. 1039, 1045–46 (1983). The *Edwards* rule requires consideration of both whether "the accused, not the police, reopened the dialogue with the authorities," and, if so, whether such waiver "was knowing and intelligent and found to be so under the totality of the circumstances." *Edwards*, 451 U.S. at 486 n. 9. The latter determination depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Oregon*, 462 U.S. at 1046 (internal quotation marks and citations omitted).

## IV. ANALYSIS

### A.    Motion to Compel (Dkt. 22)

Before addressing the merits of Rodriguez's Motion to Suppress, it is important to specify what is not at issue: initiation of the *Terry* search and Koho's reach directly into Rodriguez's right front and back pockets. Rodriguez does not dispute that Kern was justified in initiating a *Terry* search. Dkt. 25, at 5. In turn, the Government does not substantively address, and thus appears not to dispute, that Koho's reach into Rodriguez's right front and back pockets went beyond the scope of a legitimate *Terry* search.[6] The

---

[6] An officer may seize weapons or contraband during a *Terry* search if "a police officer lawfully pats down a suspect's *outer clothing* and feels an object whose contour or mass makes its identity immediately apparent[.]" *Dickerson*, 508 U.S. at 375 (emphasis added). Because the proper scope of a *Terry* search is generally limited to a suspect's outer clothing, Koho's reach directly into Rodriguez's right pockets exceeded the scope of a constitutional *Terry* search. *Terry*, 392 U.S. at 30.

Rodriguez also argues Kern also violated *Terry* in two ways: by ordering Rodriguez to lift his shirt, and by later lifting Rodriguez's shirt himself. Dkt. 38, at 2. Although Kern did order Rodriguez to lift up his shirt, Kern's body camera footage illustrates that, while Rodriguez made a gesture to lift his shirt, he did not actually lift it above his waistline, and instead almost immediately thrust his hands into his pockets. Dkt. 22-2, Ex. B at 0:55. While, under certain circumstances, lifting up a suspect's shirt may be beyond the scope of *Terry*, *United States v. I.E.V.*, 705 F.3d 430, 441 (9th Cir. 2012), Rodriguez does not cite any authority to suggest that an order to lift one's shirt—which the suspect disregards—itself constitutes an illegal search.

primary issue for the Court is whether Koho's unauthorized search of Rodriguez's right pockets tainted all of the evidence subsequently discovered by law enforcement.

      1.    *Search of left front pocket*

      a.    <u>Consent</u>

While it is undisputed that Rodriguez gave Kern consent to search his left front pocket, both whether the consent was voluntary, and, if so, whether it was sufficient to purge the taint of the illegal search of Rodriguez's right pockets, are at issue. As noted, police officers may conduct a search without a warrant if they have a suspect's consent to do so. *Schneckcloth*, 412 U.S. at 219. The Supreme Court has held that the question of whether consent to a search was "voluntary," or was the product of duress or coercion, is a question of fact to be determined from the totality of the circumstances. *Id*. at 227. In assessing whether a suspect's consent to search was voluntary, courts consider several non-exclusive factors, including: (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings had been given; (4) whether the defendant was told he had a right not to consent, and (5) whether the defendant

---

Further, in *United States v. Hill*, 545 F.2d 1191, 1193–94 (9th Cir. 1976), the Ninth Circuit held lifting a suspect's shirt to check for weapons was "well within the bounds established by *Terry*," where, as here, a suspect's shirt was hanging over the suspect's pants and the police officer noticed a large bulge that appeared to be a weapon under the suspect's shirt. Kern testified that he suspected the bulge in Rodriguez's left front pocket was a weapon. Dkt. 36, at 12:19–25 (I also saw a very large bulge in his pockets. . . when I saw that, obviously I wanted to make sure that that wasn't something that could harm or hurt me, especially if he was in some sort of intoxicated state, like the witnesses thought him to be.").

Because both ordering Rodriguez to lift his jersey and Kern's action in lifting the jersey himself were motivated by Kern's concern that Rodriguez had a weapon in his left pocket, and not by a desire to conduct a general exploratory search, the Court rejects Rodriguez's contention that Kern impermissibly expanded the legitimate scope of *Terry*. *Terry*, 392 U.S. at 20; *Hill*, 545 F.2d at 1193.

had been told a search warrant could be obtained. *United States v. Furrow*, 229 F.3d 805, 813 (9th Cir. 2000) (*overruled on other grounds*, *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001)).

Rodriguez suggests his consent was not voluntary because of Kern's "display of significant force in the moments before his request to search," including threatening to put Rodriguez, "in the dirt," telling Rodriguez he wasn't "fucking playing," and turning Rodriguez around as he "kicked his feet apart." Dkt. 22, at 16. The Government counters that Rodriguez's consent was voluntary because although he was detained, he was not in custody; Kern and Koho had not drawn their weapons and did not advise Rodriguez that they would get a warrant if he did not consent; and Kern's demeanor and request for consent (which followed the aforementioned statements and actions highlighted by Rodriguez) were calm and non-threatening. Dkt. 23, at 8. The dispute is immaterial because even if the Court determined Rodriguez's consent was voluntary, it finds Rodriguez's consent did not purge the taint of Koho's prior illegal expansion of a legitimate *Terry* search by reaching directly into Rodriguez's right front and back pockets.

Under the Fourth Amendment "evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding consent, unless subsequent events have purged the taint." *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004) ("*Washington I*") (internal quotation and alteration omitted). The test for admissibility under such circumstances is two-fold: "not only must the consent be voluntary, but it must also be 'sufficiently an act of free will to purge the primary taint.'" *United States v. Washington*, 490 F.3d 765, 776 (9th Cir. 2007) ("*Washington II*") (quoting

*Wong Sun*, 371 U.S. at 486); *see also United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1299 (9th Cir. 1988) (explaining the mere fact of voluntariness did not mean that consent was not tainted by a prior Fourth Amendment violation). The Government bears the burden of showing that the taint of an illegal search has been purged by a suspect's consent. *Id*. at 1300.

Assuming, *arguendo*, that Rodriguez's consent to search his left front pocket was voluntary, to determine whether his consent purged the taint of the prior illegal search of his right front pocket, the Court must consider: (1) the temporal proximity between the consent and the illegal seizure; (2) the presence of intervening circumstances; and (3) "particularly, the purpose and flagrancy of the official misconduct." *Washington II*, 490 F.3d at 776. Here, each of the factors weigh in favor of finding that Rodriguez's consent to search his left pocket did not purge the taint of the illegal search of his right pockets.

First, there was no time lapse between Koho's search of Rodriguez's right pockets and Kern's request to search his left pocket. Because Rodriguez gave consent to search his left pocket mere seconds after the illegal search of his right pockets occurred, the first factor supports exclusion. *Washington I*, 387 F.3d at 1073 (finding the temporal proximity of fifteen minutes between Fourth Amendment violation and defendant's consent weighed "heavily" in favor of suppressing the fruits of police officers' search).

Second, because Rodriguez's consent was almost immediately preceded by the illegal search of his right pockets, intervening circumstances were not present. Intervening circumstances are those that would "tend to dissipate the coercive environment[.]" *United States v. Patzer*, 277 F.3d 1080, 1085 (9th Cir. 2002). Examples of intervening

MEMORANDUM DECISION AND ORDER - 15

circumstances "include release from custody, an appearance before a magistrate, or consultation with an attorney," as such circumstances indicate a defendant's consent was an "unconstrained, independent decision that was completely unrelated to the initial unlawful violation." *Washington I*, 387 F.3d at 1074 (internal quotation marks and citation omitted). The record does not identify any appreciable intervening circumstances in the seconds between the illegal search and Rodriguez's consent to the subsequent search of his left pocket. Moreover, the fact that Koho had just reached into his right pockets without consent likely indicated to Rodriguez that denying consent to search his left pocket would be futile. This factor supports suppression as well.

Third, and finally, courts have found the "purpose and flagrancy" prong weighs in favor of suppression where consent follows an initial violation of the Fourth Amendment. *Washington II*, 490 F.3d at 777 (citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003)). It is impermissible for an officer to "thrust his hand into [a suspect's] pocket" with "no attempt at an initial limited exploration for arms." *Sibron v. New York*, 392 U.S. 40, 65 (1968). Setting aside the issue of Koho and Kern's description of the *Terry* search in their subsequent probable cause affidavits for the moment, the Court finds the third prong weighs in favor of suppression. Because Koho violated the well-settled limits of *Terry* when he reached directly into Rodriguez's right pockets, his conduct can be seen as purposeful.

Because all three factors weigh against admissibility, the Court cannot find Rodriguez's consent (voluntary or not) to search his left pocket purged the taint of the illegal search of his right pockets.

MEMORANDUM DECISION AND ORDER - 16

b.    Inevitable discovery and attenuation

Although the Court finds Rodriguez's consent did not purge the taint of the illegal search of his right pockets, under certain circumstances, police officers may seize contraband detected during the lawful execution of a *Terry* search. *See, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1050 (1983) ("If, while conducting a legitimate *Terry* search . . . the officer should . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression under such circumstances.").

In *Dickerson*, the Supreme Court explained:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.[7]

508 U.S. at 375–76.

The Government suggests that even if Koho had not reached into Rodriguez's right front pocket and discovered the wad of cash, Kern would have inevitably discovered the heroin through his pat-down of Rodriguez's left pocket. To establish this exception is applicable, the Government must present evidence that "by following routine procedures, the police would inevitably have uncovered the evidence." *United States v. Young*, 573

---

[7] The plain-view doctrine is another exception to the warrant requirement. "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment[.]" *Id.* at 375.

MEMORANDUM DECISION AND ORDER - 17

F.3d 711, 721 (9th Cir. 2009) (internal quotation omitted).

Here, the Government notes that prior to initiating the pat-down, Kern noticed a very large bulge in Rodriguez's left front pocket. Kern confirmed this in his probable cause affidavit, and also stated that Rodriguez repeatedly looked down at his left pocket when Kern first addressed him. Dkt. 22-3, Ex. C at 1–2. Kern's body camera footage corroborates that Rodriguez looked down at his left pocket several times while initially talking to Kern. Dkt. 22-4, Ex. B at 0:45-1:04. However, Kern's probable cause affidavit does not clarify whether or not he could determine the bulge in Rodriguez's left pocket was contraband from feeling it on the outside without reaching into Rodriguez's pocket. Instead, the affidavit states:

> Once I had him turned around I had him place his hands on top of his head. He was slow to react so I told him several times that I was not playing with him and he needed to do as I instructed. I then began a terry pat on his waistline and pocket area to ensure there were no metal type objects and what I found was a large bulge in his left pocket to include a Ziploc bag sticking out. I then asked this male 'Is there anything in your pockets that you ain't supposed to have?' He stated, 'Not that I know of.' I then asked 'Can I pull that stuff out of your pocket then?' He then said, 'Go ahead and take everything out.' Once I began pulling the Ziploc bag out of his left-hand pocket the subject advised me without any questioning that it was heroin.

Dkt. 22-3, Ex. C at 2.

Prior to the evidentiary hearing, it was unclear from the record whether Kern determined the bulge was contraband—but asked for Rodriguez's consent before pulling it out of Rodriguez's pocket—or whether Kern could not tell the bulge was contraband and thus asked for consent to pull the item out of Rodriguez's pocket. In order for the inevitable discovery doctrine to apply, the former must be the case given the Court's conclusion

MEMORANDUM DECISION AND ORDER - 18

regarding Rodriguez's consent. However, Kern confirmed during the hearing that he was not aware the bulge was contraband until he pulled it out of Rodriguez's pocket. Dkt. 36, at 42:08–42:11 ("Initially it was just the -- just the top of the baggie sticking out, and it wasn't until I was able to pull the item free that I recognized the [contraband] that was inside that bag."). Because Kern did not discover the heroin was contraband through his pat-down of Rodriguez's left pocket, and because the consent Rodriguez gave Kern to empty his left pocket was tainted by Koho's illegal search of Rodriguez's right pockets, the Court cannot find that the heroin would have been inevitably discovered through Kern's legitimate pat-down of Rodriguez's left front pocket.

The Government also argues the heroin would have been inevitably discovered because Kern would have asked Rodriguez for consent to take the Ziploc baggie out of his left pocket even if Kern hadn't known about the cash in Rodriguez's right front pocket. Kern confirmed this during the evidentiary hearing. Dkt. 36, at 19:10–19:17 (explaining he always asks for permission to search prior to reaching into pockets in order to protect his safety, noting, "I'm giving them the opportunity to let me know that, 'Yeah, you can't dig in that pocket because of A, B, and C.")

Although Kern may have inevitably asked for Rodriguez's consent to empty his left front pocket, it is entirely speculative to suggest Rodriguez would have given consent to search his left pocket had his right pockets not just been illegally searched. There is no way to know whether Rodriguez would have consented in the absence of Koho's impermissible expansion of *Terry*. The Supreme Court has instructed that the inevitable discovery doctrine cannot rely on "speculative elements," and that its application must turn "on

demonstrated historical facts capable of ready verification or impeachment[.]" *Nix*, 467 U.S. at 444 n. 5. The Court accordingly rejects the Government's contention that the heroin would have been inevitably discovered because Rodriguez would have given consent to search his left pocket even in the absence of Koho's illegal reach into his right pockets.

Finally, the Government contends Rodriguez's consent was sufficiently attenuated from the illegal search of his right pocket because Rodriguez was likely unaware that his right front pocket had even been searched. The Government notes:

> A party unaware that the police might have already seen incriminating evidence would be in the same posture for considering whether to consent to a search as a person not previously subject to an illegal entry. Lack of knowledge of a prior search is an intervening factor which dissipates the coercion inherent in a request for consent made after an unconstitutional search.

Dkt. 23, at 12 (quoting *Furrow*, 229 F.3d at 813).

The search at issue in *Furrow* involved a minor who was hiding at the time of the initial illegal search of his father's cabin. *Id*. at 814. There was evidence in the record to suggest the minor was unaware of the initial illegal search at the time he gave officers consent to conduct a second search of the cabin. *Id*. Because the district court did not make a factual finding regarding whether or not the minor knew about the first search, the Ninth Circuit remanded to the district court to determine whether, at the time he gave his consent to the second search, the minor was cognizant of the prior illegal entry. *Id*. at 815. The Court explained, "[i]f the district court finds that [the minor] had knowledge of the first search, then his consent may have been tainted, and the motion to suppress should have been granted if the [second] illegal search was a product of [his] consent." *Id*.

MEMORANDUM DECISION AND ORDER - 20

By contrast, here Rodriguez was present for, and could ostensibly feel, the illegal search, which involved Koho reaching directly into Rodriguez's pants. Under such circumstances, the Government cannot establish Rodriguez was unaware of the first search, and the Court cannot find Rodriguez's consent was sufficiently attenuated from the illegal search.

In the absence of evidence to establish the heroin would have been discovered through either a legitimate *Terry* search, or through consent untainted by the illegal search of Rodriguez's right pockets, the Court will suppress the evidence located on Rodriguez's person.

2.    *Statements prior to Miranda*

When Kern pulled the large Ziploc bag from his left front pocket, Rodriguez stated, "that's heroin." Dkt. 22, Ex. B at 2:28. Rodriguez seeks to suppress this and other incriminating statements he made prior to receiving his *Miranda* warnings.[8] The Fourth Amendment exclusionary rule applies to statements obtained in part as a result of an illegal search, if such statements "bear a sufficiently close relationship to the underlying illegality." *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) (quoting *United States v. Ladum*, 141 F.3d 1328, 1336–37 (9th Cir. 1998)); *see also United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) ("It is well established that the Fourth Amendment's exclusionary rule applies to statements and evidence obtained as a product of illegal searches and seizures.") (citing *Wong Sun*, 371 U.S. at 484–88).

---

[8] The Court discusses statements Rodriguez made after he invoked his *Miranda* rights below.

Because the Court has found the reach into Rodriguez's right pockets constituted an illegal search, the Court first asks whether Rodriguez's subsequent statements were the product of the illegal search; if they were, the Court must then consider whether the statements were nevertheless so attenuated from the search that suppression is not warranted. *Shetler*, 665 F.3d at 1157. It is the Government's burden to show that Rodriguez's statements were not obtained illegally. *Id*. (citing *Patzer*, 277 F.3d at 1086).

Rodriguez contends his utterance, "that's heroin," was induced by the contraband pulled from his left pocket and by Kern and Koho's questions about that contraband. The Government does not address the statements Rodriguez made prior to asking to speak to his attorney and has produced no evidence or argument to demonstrate that Rodriguez's statements were not induced or influenced by the illegal search of his right pockets.

The Government has not met its burden and the Court must agree with Rodriguez. The Ninth Circuit has held an illegal search is particularly likely to taint any subsequent confession because "officers may confront the suspect, either physically or verbally, with the evidence that has been illegally obtained," and because "[c]onfronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent." *Id*. at 1158. Here, Rodriguez was confronted with the heroin—evidence tainted by the illegal search of his right pockets—and immediately made the statements he now seeks to suppress. The Court finds such statements were a product of the illegal search.

The Government has also failed to meet its burden of showing that, even if Rodriguez's statements were the product of the illegal search, they were nevertheless sufficiently attenuated from the officer's illegal conduct so as not to warrant suppression.

MEMORANDUM DECISION AND ORDER - 22

The Government does not address the attenuation factors with respect to Rodriguez's incriminating statements. However, the temporal proximity between the statements and the illegal search of Rodriguez's right front pocket, the absence of intervening circumstances, and Koho's violation of the well-settled limits on the scope of a legitimate *Terry* search, each weigh in favor of suppression. The Court will accordingly suppress the statements Rodriguez made following discovery of the heroin and prior to invoking his right to an attorney.

3.    *The Canine Alert*

In *Illinois v. Caballes*, 543 U.S. 405, 410 (2005), the Supreme Court held the Fourth Amendment does not require reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop. Defendant in *Illinois* was legitimately stopped for speeding while another officer walked his dog around the defendant's car and obtained a positive alert for drugs. *Id*. at 406. The Supreme Court determined, "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id*. at 410. In so holding, the Court explained:

> Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment. We have held that any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'comprises no legitimate privacy interest.' This is because the expectation 'that certain facts will not come to the attention of authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'

*Id*. at 408–09 (quoting *United States v. Jacobsen*, 466 U.S. 109, 122–123 (1984)).

MEMORANDUM DECISION AND ORDER - 23

Rodriguez concedes that he was legitimately stopped for a *Terry* investigation at the time Kern ordered the canine unit. Dkt. 25, at 5. Like a traffic stop, the tolerable duration of a *Terry* seizure, "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Rodriguez v. United States*, 575 U.S. 348, 353 (2015) (noting a "seizure justified only by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket.").[9] Rodriguez does not argue that the canine sniff prolonged his encounter with police beyond the time reasonably required to complete the *Terry* stop.[10] However, even if the canine sniff did prolong the interaction, an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion. *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015); *Royer*, 460 U.S. at 505 n. 10 ("In the case before us, the officers, with founded suspicion, could have detained [defendant] for the brief period during which Florida authorities at busy airports seem able to carry out the dog-sniffing procedure.").

Although he does not suggest either that the canine sniff unlawfully prolonged his detention or that the officers lacked reasonable suspicion to order a canine sniff, Rodriguez

---

[9] Traffic stops and *Terry* seizures are analogous. *Rodriguez*, 575 U.S. at 353. In the absence of reasonable suspicion to prolong the stop, both must both be temporary and last no longer than is necessary to effectuate the purpose of the investigation. *Id.*; *Royer*, 460 U.S. at 500.

[10] Kern ordered Rodriguez to put his hands on his head one minute and forty seconds into Koho's body camera footage. Dkt. 22-4, Ex. D at 1:40. The canine sniff occurred fifteen minutes into Koho's video. *Id.* at 15:00. Thus, approximately thirteen minutes and twenty seconds elapsed between the beginning of the *Terry* search and the canine sniff.

contends the canine alert on his car must be suppressed as fruit of the illegal search of his right pockets. "Evidence qualifies as the "fruit of a poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (internal quotation marks and citation omitted). To qualify as "fruit," challenged evidence must "in some sense [be] the product of illegal governmental activity." *Crawford*, 372 F.3d at 1056 (quoting *New York v. Harris*, 495 U.S. 14, 19 (1990)).

Rodriguez argues the canine sniff was a direct result of the illegal search because Kern told Koho to "get the canine" immediately after viewing the roll of cash Koho had illegally pulled from Rodriguez's right front pocket. Dkt. 22, at 19 (citing Dkt. 22-4, Ex. D at 2:24). Kern had not yet discovered the controlled substance in Rodriguez's left pocket when he issued this order. Thus, Rodriguez argues the illegal search of Rodriguez's right pocket, standing alone, was the "impetus for the chain of events leading to" the canine's subsequent positive alerts on the driver's side of the white Cadillac. Dkt. 22, at 19 (quoting *Gorman*, 859 F.3d at 716).[11]

---

[11] Relying on *Gorman*, Rodriguez advocates an "impetus" test for determining taint. Dkt. 22, at 19. *Gorman* cited *Johns*, 891 F.2d at 245–46, in support of this "impetus" standard. The Ninth Circuit has clarified that the "impetus" language in *Johns* was "clearly dictum," and that the *Johns* Court premised its holding upon a much narrower ground: the district court's express finding that the investigation occurred as a "direct result" of an initial illegal identification. *United States v. Smith*, 155 F.3d 1051, 1061 (9th Cir. 1998). In *Smith*, the Ninth Circuit noted that an "impetus" standard is "functionally equivalent to a 'but for' test for evaluating taint, a test both the Supreme Court and this court have repeatedly renounced." *Id*. (citations omitted). The *Smith* Court also rebuffed the defendant's argument that the taint inquiry should be viewed "in terms of links of a causal chain leading to incriminating evidence." *Id*. (internal quotation marks and alteration omitted). The *Smith* Court rejected such a "logical causation standard" as tantamount to a "but for" test, which is not appropriate. *Id*.   The Court explained:

> Contrary to [defendant's] suggestions, under Ninth Circuit precedent, the baseline inquiry
> in evaluating taint is not whether an unlawful search was the 'impetus' for the investigation

MEMORANDUM DECISION AND ORDER - 25

The Court disagrees. In *Gorman*, the Ninth Circuit suppressed contraband discovered after a positive dog sniff conducted in the context of a lawful, but pretextual, traffic stop, because the dog sniff was impelled by suspicion another officer obtained through an illegally prolonged stop made an hour earlier. *Id*. at 718. Because the first illegal stop "significantly directed" law enforcement's actions in conducting the second stop, the contraband discovered after the dog sniff constituted the fruit of the illegal seizure from an hour earlier. *Id*. at 716. In *Gorman*, police would not have made the second pretextual stop—or ordered a canine sniff—in the absence of suspicion accrued during the course of defendant's first unlawful detention. *Id*. at 717.

By contrast, here the *Terry* stop was undisputedly initiated based on Kern's reasonable suspicion of illegal activity due to Rodriguez's behavior prior to Koho's impermissible search. The evidence suggests that Kern's request for a canine search was based on the same factors, as well as those gleaned during the lawful portion of the *Terry* stop. Namely, before encountering Rodriguez, Kern had already checked Rodriguez's license plates and learned that the plates were for a blue 2002 Chevy Cavalier, and not for the white Cadillac Rodriguez left running in front of Commercial Tire's entrance. Dkt. 22-3, Ex. C, at 1. Kern also knew Rodriguez was likely under the influence, as Commercial Tire employees had reported that Rodriguez "appeared to be on something and at one point

---

or whether there exists an unbroken 'causal chain' between the search and the incriminating evidence; rather, courts must determine whether 'anything seized illegally, or any leads gained from illegal activity, tend[ed] *significantly to direct* the investigation on toward the specific evidence sought to be suppressed.'

*Id*. at 1061 (emphasis in original) (quoting *United States v. Cales*, 493 F.2d 1215, 1216 (9th Cir. 1974)).

MEMORANDUM DECISION AND ORDER - 26

was following not only customers but staff into the bay not making any sense at all." *Id*. Commercial Tire employees further reported that Rodriguez had driven to the store, was wearing a white Lakers jersey, and was covered in tattoos, a description Kern confirmed when he encountered Rodriguez. *Id*. at 2 ("I also recognized that he had several tattoos on his face and arms that would indicate his gang affiliation.").

Once Kern stopped Rodriguez, Rodriguez "appeared to square up" to Kern. *Id*. Kern also verified that Rodriguez appeared to be under the influence of drugs when he noticed Rodriguez had "an extremely clenched jaw and squinty eyes," "was smacking his lips and . . . had a very dry mouth," spoke "as if he had a very thick swollen tongue,"[12] and "was slow to react"—all signs of "an intoxicated state." *Id*. at 1–2. Kern also immediately noticed Rodriguez had a "very large bulge in his left front pocket," and saw that Rodriguez "looked at his left pocket and waistline area several times as [Kern] spoke with him." *Id*. Further, Rodriguez "quickly thrust his hands into his pockets" before Kern initiated the *Terry* search and refused to put his hands on his head until Kern had ordered him three times to do so. *Id*. at 2; Dkt. 22-2, Ex. B, at 1:05–1:11. All of this occurred before Koho reached into Rodriguez's right pockets.

Where, as here, "the evidence sought to be suppressed was discovered through utilization of some legally obtained leads as well as some illegally obtained leads, the

---

[12] Rodriguez's wife testified during the evidentiary hearing that Rodriguez has a "split tongue" that makes his speech hard to understand on occasion. Dkt. 36, at 115:1–6. Although this may account for Rodriguez's slurred speech, Kern and Koho had no way to know about Rodriguez's split tongue at the time of the encounter, and thus could reasonably conclude Rodriguez was slurring his words due to intoxication. Further, a split tongue does not account for the other signs of intoxication Rodriguez exhibited, such as his incoherence, lip smacking, clenched jaw, and actions while inside Commercial Tire.

substantiality of the legally obtained leads may influence the determination whether the evidence ought to be suppressed." *United States v. Bacall*, 443 F.2d 1050, 1056 (9th Cir. 1971). If "the illegally obtained leads were so insubstantial that their role in the discovery of the evidence sought to be suppressed 'must be considered de minimis,' then suppression is inappropriate." *Id*. (quoting *Durham v. United States*, 403 F.2d 190, 196 (9th Cir. 1968)).

While Koho's unconstitutional search of Rodriguez's right pockets may have bolstered support to call for a canine, such support was de minimis in light of the evidence obtained during the lawful portion of the *Terry* stop. The significance of cash in Rodriguez's pocket paled in comparison to the above-described evidence obtained during the legal portion of the *Terry* stop. As the Government notes, there is nothing illegal about carrying money in one's pocket, and Kern had a reasonable basis for his suspicion that Rodriguez had narcotics—and for ordering a canine search of Rodriguez's vehicle—well before he viewed the cash. Unlike in *Gormon*, where officers only obtained reasonable suspicion through an unlawful detention, Rodriguez's actions prior to the illegal search of his right pocket provided reasonable suspicion to order the canine sniff of the Cadillac.

The testimony during the evidentiary hearing supports this conclusion. Specifically, Kern clarified that a large roll of cash is not evidence that a suspect has been selling something on the black market. Dkt. 36, at 36:10–17 ("It's not evidence. People do carry cash. . . it's not evidence on its face that he's a drug dealer."). When questioned, "in order to consider that evidence, would you be looking for some other piece of evidence to tie it together as being related to something illegal?" Kern answered: "Yes of course. If we found no reason to investigate or illegal items, he simply would have walked away with that cash.

It's not by itself any type of evidence." *Id.* at 50:5–10.

Thus, this is not a case where officers took investigatory steps that they would not have taken otherwise because they learned of new information through an illegal search. *Wong*, 371 U.S. 487–88 (explaining the apt question for determining whether evidence is fruit of the poisonous tree is "whether, granting establishment of primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.") (internal quotation marks and citation omitted). Kern and Koho knew that Rodriguez had just driven a vehicle with mismatched plates and had reason to believe he was under the influence of opiates, methamphetamine, or both. *Id.* at 14:19–25; 19:18–25; 20:2–6; 66:18–23; 67:9–15; 68:25; 69:1–7. The illegal search of Rodriguez's right pockets, which produced no illegal evidence, did not significantly direct the canine search since the officers had reasonable suspicion to conduct a canine search with or without viewing the cash. *Crawford*, 372 F.3d at 1058.[13]

Given Rodriguez's obvious intoxication, mismatched license plates, apparent gang affiliation, actions once stopped by Kern, and fact he both drove to and left a running vehicle directly outside of Commercial Tire's front door, the Court finds the officers had reasonable suspicion—independent from the cash in Rodriguez's pocket—that impelled Kern's request for a canine unit and permissibly prolonged the *Terry* stop. Under such

---

[13] The Ninth Circuit has "rejected the proposition that evidence must be suppressed if produced during an investigation which was merely intensified because of information discovered during an illegal search." *United States v. Allard*, 600 F.2d 1301, 1305 (9th Cir. 1979) (citations omitted).

circumstances, the officers could have simply detained Rodriguez until the drug-sniffing

dog arrived on the scene. *U.S. v. Ramirez*, 473 F.3d 1026, 1031 (9th Cir. 2007). Thus, the

canine sniff was not a fruit of the illegal search of Rodriguez's right pockets.[14] *Id.* (holding

that where an unlawful arrest was not a causal factor in officers' discovery of cocaine and

search was otherwise based on previously gathered information aimed at establishing

probable cause to search for contraband, cocaine would not be suppressed as fruit of

unlawful arrest); *United States v. Pulliam*, 405 F.3d 782, 791 (9th Cir. 2005) (holding that

a gun should not be suppressed as fruit of an allegedly invalid detention where the invalid

detention "simply did not contribute or lead to" the discovery of the firearm); 6 WAYNE

LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.4(a), at

260 (5th ed. 2019) ("[I]f not even the 'but for' test can be met, then clearly the evidence is

not a fruit of the prior Fourth Amendment violation.").

Moreover, even if the canine sniff was the "fruit" of the illegal expansion of *Terry*,

the Court finds the canine sniff is admissible under the inevitable discovery doctrine.

Inevitable discovery demands that the prosecution show both that police legally could have

uncovered the evidence and that police would have done so. *Ramirez-Sandoval*, 872 F.2d

---

[14] As noted, Rodriguez contends discovery of the cash, "standing alone" caused the canine sniff because Kern asked for a canine as soon as he saw the cash. Dkt. 22, at 20. Although, as explained above, the Court disagrees with this contention, Rodriguez's behavior provided lawful grounds for both the *Terry* stop and further investigation, regardless of Kern's purported motivation for ordering the canine sniff. *Brigham City, Utah v. Stewart*, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.') (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers[.]"); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[O]ur prior cases make clear" that "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment").

at 1399–1400. The first test is met, where, "the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself." *Boatwright*, 822 F.2d at 864–65. Here, the "fact that made discovery" of Rodriguez's narcotics inevitable—his impaired state, mismatched plates, the presence of narcotics in the vehicle he left running in a parking lot open to the public, and the need for further investigation prior to allowing him to drive—are facts "born of circumstances other than those brought to light" by the search of Rodriguez's right pockets. *Id*. Clearly, the officers could have ordered the dog sniff absent discovering the cash in Rodriguez's pocket.

During the evidentiary hearing, Kern also confirmed that he would have conducted further investigation regardless of whether he had found anything illegal or suspicious on Rodriquez:

> Q.   Okay. And now in this case when -- if confronted with an individual who is exhibiting the same behavior as Mr. Rodriguez that you observed and that the store employees relayed to dispatch, along with the license plates not matching the vehicle that he arrived in, what would your next step have been in dealing with this situation had you not found any drugs or weapons or contraband on this person?

> A.   I would have continued with asking him -- we would have got further along in the questioning as to how he got there, who he came with, why he came to the store. The indicators of drug use [were] a high factor in that we would have likely turned that into a DUI investigation if we had witnesses that saw him drive to the store. It appears that he did. . . . I could see indicators of drug use on his person. . . .

> Q.   Okay. So had the drug items not been found, based on the behavior you observed when he came into the store and the report that he had arrived in that white Cadillac, you would have conducted a DUI investigation?

> A.   Yes, ma'm. Yes, ma'am.

MEMORANDUM DECISION AND ORDER - 31

*Id*. at 19:18–25; 20:1–5, 11–13, 17–21.

Koho also testified that he would have ordered a canine search regardless of viewing the cash due to Rodriguez's apparent intoxication:

> Q.   So you indicated that you observed -- the observations you made when you arrived on scene led you to believe that Mr. Rodriguez was under the influence of an intoxicant?
>
> A.   Yes.
>
> Q.   Can you describe what specific signs you observed?
>
> A.   Well, the main things that he was doing was a lot of smacking of the lips. That  is a very common symptom of opiate use. He was also extremely agitated and having difficulty forming a sentence, which is frequently observed with stimulants. It appeared to me that he was likely under the influence of both heroin and methamphetamines before we even found anything.
>
> Q.   Okay. So based on those observations that you believed he was under the influence of controlled substances, would you have called for a canine unit to run around the vehicle?
>
> A.   Yes, see if we can get an alert and search the vehicle to look for the substance that he's impaired by for the DUI investigation.

*Id*. at 67:9–21.

The Government has established that by following routine procedures the police both could have, and would have, ordered the canine sniff of Rodriguez's vehicle. Because—even if was a fruit of the illegal search of Rodriguez's right pockets—the canine sniff is admissible under the inevitable discovery exception to the "fruits" doctrine, the Court finds the canine sniff is admissible.

### 4.   *Search of the Cadillac*

A warrantless search of an automobile is reasonable under the Fourth Amendment

if officers have "probable cause to believe that the vehicle contains contraband" such that the "facts . . . would justify the issuance of a warrant, even though a warrant has not actually been obtained." *United States v. Ross*, 456 U.S. 798, 808–809 (1982); *see also United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) ("Officers may conduct a warrantless search of an automobile, including containers within in, when they have probable cause to believe that the vehicle contains contraband or evidence of criminal activity."). To meet the probable cause requirement, the Court must determine if, under the totality of the circumstances, there was a fair probability that contraband or evidence of a crime would be found in the car searched.[15] *Id.* (internal quotation marks and citation omitted). A positive alert from a drug-detection canine provides such probable cause.[16] *Florida v. Harris*, 568 U.S. 237, 247–48 (2013). Since the positive canine alert gave officers probable cause to search Rodriguez's vehicle, the Court will not suppress the evidence located in the Cadillac.

Because the parties have not raised the issue, the Court is not ruling on whether the inevitable discovery exception would allow for admission of the contents of Rodriguez's pockets because Rodriguez would have been lawfully searched incident to arrest after the

---

[15] No separate exigency is needed to invoke the automobile exception, so long as the vehicle is considered readily mobile. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *see also United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) (finding that because cars are inherently mobile and attended by a "relatively minimal expectation of privacy," the applicability of this exception "does not turn on whether the car's owner or driver has already been taken into custody or the risk of mobility has otherwise been eliminated"). The fact that Rodriguez was detained at the time the Cadillac was searched thus does not alter the Court's conclusion that the automobile exigency applies.

[16] In the absence of any evidence or argument to challenge the validity of the drug dog's positive alert, the positive alert gave the Nampa Police Officers probable cause to search the Cadillac. *Harris*, 568 U.S. at 247.

drugs were found in his vehicle. Although it seems likely, there was no testimony at the evidentiary hearing to confirm that the officers would have conducted a search incident to arrest if contraband had been found in Rodriguez's car. Further, in its Opposition to the Motion to Suppress, the Government initially argued that search of Rodriguez's vehicle was inevitable because even if Koho had not searched Rodriguez's right pocket, Kern would have found the heroin in Rodriguez's left pocket, Rodriguez would have been arrested for possession of a controlled substance, and his car would have been searched incident to his arrest. Dkt. 23, at 13. The Court has rejected this contention since the heroin was the fruit of the illegal search of Rodriguez's right front pocket. *See*, *supra*, section IV.A.1.b.

During the evidentiary hearing and in its Supplemental Brief, the Government argued that Rodriguez would have inevitably been transported to the police station for a full drug recognition evaluation (a de facto arrest), and that Rodriguez would have been validly searched incident to such arrest, even absent the illegal search of his right front pocket. Dkt. 36, at 66:24–67:3, 68:2–12; Dkt. 37, at 3–4. However, the Fourth Amendment does not permit the "involuntary removal of a suspect . . . to a police station and his detention there for investigative purposes . . . absent probable cause or judicial authorization." *Hayes v. Florida*, 470 U.S. 811, 815 (1985). While the officers had reasonable suspicion to order a canine sniff independent from the heroin, they lacked probable cause to arrest Rodriguez until after they searched his vehicle and located the contraband therein.

Unlike a transport to the police station, a *Terry*-stop is not transformed into a de

MEMORANDUM DECISION AND ORDER - 34

facto arrest when a defendant is moved from the street to the back of a police car. *United States v. Baron*, 860 F.2d 911, 915 (9th Cir. 1988); *see also United States v. Bautista*, 684 F.2d 1286, 1289-90 (9th Cir. 1982) (holding a brief but complete restriction of liberty, such as handcuffing the suspect, can be permissible during a *Terry* stop and does not convert the stop into an arrest). While officers here had reasonable suspicion—independent from the illegal search—to stop Rodriguez and to remove him to the back of Koho's police car while they ran a canine around his vehicle, they lacked probable cause to take him to the police station until they searched his vehicle after obtaining the positive canine alert. Because the Government argues that Rodriguez would have inevitably been taken to the police station and searched *without* probable cause, rather than that he would have been arrested and searched because officers would have obtained probable cause to arrest him through the search of his vehicle, the Court declines to further address the issue of whether officers would have inevitably discovered the heroin on Rodriguez's person in a search incident to arrest due to the contraband discovered in his vehicle.

    5.    *"The cover up"*

    Rodriguez also argues all evidence should be suppressed due to Kern and Koho's purposeful misconduct. Rodriguez suggests Kern and Koho sought to obscure the fact that Koho unlawfully searched his right pockets because they knew the discovery of cash in Rodriguez's right front pocket was illegal, and consequently later wrote in their probable cause reports that the cash was "found" or "located" during—not prior to—a subsequent search incident to Rodriguez's arrest. Dkt. 25, at 2.

    Rodriguez contends these facts cast "grave doubt" on the police officers' credibility

in this case. Dkt. 25, at 2. Rodriguez notes: "If a police officer and his partner discover contraband during an unlawful search, but then both officers write in their reports that the discovery actually occurred during a lawful search as a different time, the strong inference is that they are seeking to conceal their misconduct from judicial scrutiny." Dkt. 25, at 2–3.

After listening to their testimony, the Court is not convinced that either Kern or Koho's police report was purposely deceptive. Kern testified that although he believes he must have seen it, he has no memory of seeing the cash when Koho held it up after searching Rodriguez's right front pocket:

> Q.    And you recognized what Officer Koho showed you?
>
> A.    I could have. I honestly don't recall visually looking at the money.
>
> Q.    You recognized it was a roll of money?
>
> A.    I could have. I don't recall. Even watching my video, I don't remember recognizing the money, but I likely did. I likely looked at whatever he had in his hands.
>
> Q.    So Officer Koho held it out and showed it to you?
>
> A.    In the video, I believe that's what is shows, yes, sir. I'm not trying to say that I didn't see the money; I'm saying I don't recall seeing the money, and I don't recall putting it in my report.

Dkt. 36, at 34:4–15.

When defense counsel attempted to refresh Kern's memory by showing him Koho's body camera footage, Kern further explained: "Like I said, the video clearly shows him pulling money out and displaying it, but I don't recall actually looking at that money. I'm not trying to be difficult, promise. But truly, my focus was on that front left pocket." *Id.* at

37:5–8. Kern testified his focus was on Rodriguez's left pocket because he believed Rodriguez may be carrying a weapon, and that, due to this belief, he "was fairly amped up at the time of the search" and could not "recall seeing the cash in first incident." *Id.* at 12:19–25; 47:20–24. In light of such testimony, it is unclear whether Kern was even aware Koho had reached into Rodriguez's pocket, let alone that he recognized the cash as significant. Kern's failure to record Koho's initial discovery of the cash in his probable cause affidavit does not seem intentional, but rather reflective of the intense nature of the encounter and Kern's immediate focus on potentially disarming Rodriguez.

Koho's testimony also suggested that his omission of the initial discovery of the cash in his police report was unintentional. When questioned whether, at the time he found the cash, Koho believed this discovery was significant, Koho testified: "At that time I was looking for weapons. It wasn't a weapon. I put it back, didn't think anything about it again until we started finding all the things that [came] later." *Id.* at 57:1–4. Koho also noted, "I actually didn't even recall that I had pulled that out of his pocket until I reviewed my video," and that, in his police report, he listed items obtained from Rodriguez's person in the sequence of "when they had become evidentiary in nature." *Id.* at 57:22–25.

Koho further explained how the timing and process of writing a probable cause affidavit can inherently affect the details of the report:

> Q.    Prior to writing your probable cause affidavit, do you generally have
>       an opportunity to review the entire -- entirety of the body cam footage
>       for an incident?
>
> A.    No, usually not any part of it.

Q.      Do you have a pretty tight timeline on getting your probable cause affidavits turned in?

A.      It has to be done at the end of shift, and of course we're subject to other calls and other reports as well. So usually report writing time is compressed.

Q.      In this case did you have the opportunity to review your body camera before writing your probable cause affidavit?

A.      I did not.

Q.      Did you have the benefit of reviewing it on scene?

A.      I did not.

*Id*. at 108:1–14.

Koho's focus on locating a weapon, the compressed timeframe for writing his probable cause affidavit, and his inability to view the body camera footage before writing his report are legitimate explanations for the report's inaccuracy which undermine Rodriguez's claim that Koho was intentionally deceptive in his police report.

However, even if the officers were intentionally misleading in their police reports, the Supreme Court has, as mentioned, repeatedly held that an officer's subjective motivations are irrelevant when determining whether a particular search or seizure is permissible under the Fourth Amendment. *Supra*, note 14. Thus, the purported "cover-up" does not constitute an independent basis to suppress the evidence discovered in Rodriguez's Cadillac.[17]

---

[17] Although he initially claimed that he didn't know who the Cadillac belonged to, Rodriguez told Coronado that he had recently purchased the Cadillac when he was questioned on March 19, 2019. Dkt. 22-8, Ex. H at 2.

MEMORANDUM DECISION AND ORDER - 38

6.      *Statements to police following Miranda*

Rodriguez argues the statements he made after invoking his right to an attorney must be suppressed because first Koho, and then Coronado, continued to question him after he unambiguously invoked his *Miranda* rights. Dkt. 22, at 20–23. The Government counters that Rodriguez's invocation was not unambiguous, and that Rodriguez waived his rights when, after being advised of and understanding his *Miranda* rights, he initiated further conversation with Koho.

The Government suggests Rodriguez's invocation was ambiguous because, "in between incoherencies, Rodriguez made a comment to Koho about calling his lawyer." Dkt. 23, at 16. A review of Koho's body camera footage shows Rodriguez instead clearly stated, "I want to call my lawyer dude." Dkt. 22-4, Ex. D, at 12:24. This constitutes an unambiguous invocation of Rodriguez's right to counsel. *United States v. de la Jara*, 973 F.2d 746, 750–51 (9th Cir. 1992) (holding defendant's request to call his attorney constituted invocation of *Miranda* rights). Rodriguez further confirmed his desire to consult with counsel by repeating, "I want to call my lawyer now dude." Dkt. 22-4, Ex. D, at 12:25. Rodriguez's statements constituted an unequivocal *Miranda* invocation. *See, e.g.*, *Robinson v. Borg*, 918 F.2d 1387, 1392 (1990) (summarizing cases finding similar or less direct requests than the aforementioned invocation to be unequivocal).[18]

---

[18] Rodriguez did ambiguously respond, "[c]an you try to just fucking, I talk to her like, try to bail me out" when Koho attempted to clarify, "okay, so you don't want to talk to me anymore without an attorney?" Dkt. 24-2, Ex. D at 12:26. However, the Supreme Court has held, "[u]sing an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is . . . intolerable. *Smith v. Illinois*, 469 U.S. 91, 99 (1984) (emphasis in original).

MEMORANDUM DECISION AND ORDER - 39

The Government also argues Rodriguez himself initiated further communication and exchanges with the police after invoking his right to an attorney and thus waived his right to an attorney. For instance, Rodriguez questioned Koho about the gun Koho located in the back of the Cadillac, and thus purportedly illustrated "a willingness and a desire" to discuss the investigation, thereby waiving his *Miranda* rights. Dkt. 23, at 16–17. However, a suspect cannot "reinitiate" conversation when an investigation never ceased. *Martinez v. Cate*, 903 F.3d 982, 996 (9th Cir. 2018).

Here, after Rodriguez requested an attorney, Koho immediately stated that he would stop questioning Rodriguez about the heroin but that he would continue to question him about the ownership of the Cadillac. Dkt. 22-4, Ex. D, at 12:40. Although Koho testified that he needed to ask questions about the car in order to determine what to do with it, *Edwards* sets a "bright-line rule that *all* questioning must cease after an accused requests counsel,"[19] and a "switch of subject" in response to an invocation of *Miranda* rights does not satisfy the requirement that interrogation must cease. *Christopher v. State of Fla.*, 824 F.2d 836, 845 (11th Cir. 1987). After Rodriguez unambiguously invoked his right to an attorney, Koho continued to ask about the car, and later asked Rodriguez about his suitcase and other issues. Coronado also immediately started questioning Rodriguez upon his arrival, even though Koho advised Coronado that Rodriguez had invoked his *Miranda* rights. *Id*. at 33:52–37:45. Both officers' conduct illustrates the interrogation never ceased after Rodriguez's unambiguous invocation, so Rodriguez could not waive his *Miranda*

---

[19] *Smith*, 469 U.S. at 98 (emphasis in original).

rights by "reinitiating" the conversation. *Martinez*, 903 F.3d at 996.

Moreover, *Edwards* requires the government to show not only that a suspect reinitiated conversation, but that he knowingly, intelligently, and voluntarily waived the previously asserted right to counsel. *Rodriguez v. McDonald*, 872 F.3d 908, 921 (9th Cir. 2017). A knowing waiver is one "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks and citation omitted). Rodriguez could not knowingly waive his right to counsel because he continued speaking only after Koho erroneously communicated that Rodriguez's invocation protected him from questioning regarding the heroin, but not from questioning regarding the Cadillac.

Finally, Rodriguez's waiver cannot be considered "knowing" because he was too "incoherent" and/or "impaired" to communicate with officers, as the Government itself argues. Dkt. 23, at 16; *see Tague v. Louisiana*, 444 U.S. 469, 470 (1980) (the government bears the burden of showing a knowing and intelligent waiver of *Miranda* rights); *United States v. Auginash*, 2017 WL 3190650, at *13 (D. Minn. 2017) (holding that extremely intoxicated defendant could not knowingly and intelligently waive *Miranda* rights). Accordingly, the Court cannot find Rodriguez knowingly and willingly waived his right to an attorney and will suppress statements Rodriguez made on the day of his arrest and when he was again interrogated on March 19, 2019.[20]

---

[20] Because police returned to interrogate Rodriguez on March 19, 2019, without making counsel available to him, Rodriguez's March 19, 2019 statements did not amount to a valid waiver and are hence inadmissible. *Edwards*, 451 U.S. at 487.

MEMORANDUM DECISION AND ORDER - 41

### B.      Motion to Compel (Dkt. 27)

Finally, in its Opposition to the Motion to Suppress, the Government argued that even if there had been no canine alert and if Rodriguez had not been arrested, the officers would have had to do an inventory search of the Cadillac, and would have discovered the drugs and firearm located in the car. Dkt. 23, at 13. The Government suggested an inventory search of the Cadillac was inevitable because the vehicle was unlawfully parked, the officers were unable to find someone who could take possession of and move it, and because Rodriguez was both intoxicated and unlicensed and could not lawfully move the vehicle. *Id.*

Rodriguez sought additional discovery pertaining to the Nampa Police Department's execution of its policies regarding vehicle towing and inventory searches, but the Government did not produce it. When Rodriguez thereafter moved to compel such discovery, the Government represented that it would not pursue its argument that evidence in the vehicle would have inevitably been discovered pursuant to an inventory search.[21] The parties subsequently filed a Stipulation to Withdraw Motion to Compel Discovery, in which they agreed the Motion to Compel was moot. Dkt. 29, at 1. Pursuant to the parties' Stipulation, the Motion to Compel is MOOT and therefore DENIED.

///

///

///

///

---

[21]The Court accordingly does not address this argument regarding inevitable discovery.

## V. ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.      Rodriguez's Motion to Suppress is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** to the extent Rodriguez seeks suppression of the contraband in his pockets and statements he made to police on March 18, 2019, both before and after he invoked his *Miranda* rights, and on March 19, 2019; the Motion is **DENIED** to the extent Rodriguez seeks suppression of evidence located in the Cadillac or suitcase inside the Cadillac;

2.      Pursuant to the Stipulation by the parties (Dkt. 29), Rodriguez's Motion to Compel (Dkt. 27) is **MOOT** and therefore **DENIED**.

DATED: July 9, 2020

David C. Nye
Chief U.S. District Court Judge